# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| PLIANT CORPORATION,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>MSC MARKETING & TECHNOLOGY,<br>INC. d/b/a/ SIGMA STRETCH FILM and<br>ATLANTIS PLASTICS, INC.,<br><br>　　　　Defendants. | No. 04 C 3509<br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

On May 20, 2004, Plaintiff Pliant Corporation ("Pliant") filed suit against Defendants MSC Marketing & Technology ("Sigma") and Atlantis Plastics, Inc. ("Atlantis") alleging infringement of United States Patent No. 5,531,393 ("'393 patent"). The subject of the '393 patent is a plastic stretch film that is stretched and marked with an embossed surface to make the roll easier to unwind. The inventor was not the first to devise specially-wrapped rolls of plastic film. According to the patent, the problem with prior rolls was the propensity of the plastic film to weld together and rip upon unwinding. The stated benefits of the present invention include increased ease in unwinding the rolls of film and strengthened tear characteristics. The patent contains two independent and several dependent claims. The parties have asked me to construe the meaning of several disputed claim terms.

### A. *Principles of Claim Construction*

Claim construction is a matter of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). In order "[t]o ascertain the meaning of claims, [the court] consider[s] three sources: The claims, the specification, and the prosecution history."

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd* 517 U.S. 370 (1996). These three sources are the intrinsic evidence, public records available for all to consult when determining the meaning and scope of a patent claim. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). When the intrinsic evidence unambiguously describes the scope of a patented invention, reliance on extrinsic evidence, such as expert testimony and treatises, is inappropriate. *Id*. at 1583.

Claim interpretation begins with the actual words of the claims. *Bell Communs. Research v. Vitalink Communs. Corp.*, 55 F.3d 615, 619-20 (Fed. Cir. 1995); *see also Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002). Generally, the words, phrases and terms in patent claims should receive their ordinary and accustomed meaning. *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999). The strong presumption in favor of the ordinary meaning may be overcome only when the patentee "clearly set[s] forth a definition for a claim term in the specification." *Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306 (Fed. Cir. 2003) (*citing Johnson Worldwide Assoc.*, 175 F.3d at 989-90). "[A] technical term used in a patent claim is interpreted as having the meaning a person of ordinary skill in the field of the invention would understand it to mean." *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1372 (Fed. Cir. 2001) (citation omitted).

> Because dictionaries, and especially technical dictionaries, endeavor to collect the accepted meanings of terms used in various fields of science and technology, those resources have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention.

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (citation omitted).

2

"[C]laims must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979 (citations omitted). The specification may reveal "whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Vitronics Corp.*, 90 F.3d at 1582 (noting also that "the specification is always highly relevant to the claim construction analysis . . . [u]sually, it is dispositive; it is the single best guide to the meaning of a disputed term"). The specification also serves as an aid in determining "the meaning of the claim term as it is used . . . in the context of the entirety of [the] invention." *Interactive Gift Express, Inc. v. Compuserve Inc.*, 231 F.3d 859, 866 (Fed. Cir. 2000) (quoting *Comark Communs., Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998)).

The claims, however, are not limited to the embodiment shown in the specifications. *Anchor Wall*, 340 F.3d at 1307; *Transmatic, Inc. v. Gulton Indus.*, 53 F.3d 1270, 1277 (Fed. Cir. 1995). Limitations appearing only in the specifications cannot be read into a claim because "the claim, not the specification, measures the invention." *Howes v. Zircon Corp.*, 992 F. Supp. 957, 961 (N.D. Ill. 1998) (*citing SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107 (Fed. Cir. 1985)). However, when the specification "makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed Cir. 2001).

Each patent has a corresponding publicly-available record called the prosecution history, which details the proceedings before the Patent and Trademark Office ("PTO"). The prosecution history may limit the interpretation of claim terms by revealing express representations made by

the applicant regarding the scope of the claims or by excluding interpretations that were disclaimed during prosecution. *Vitronics*, 90 F.3d at 1582-83 (citations omitted). However, "unless altering claim language to escape an examiner rejection, a patent applicant only limits claims during prosecution by clearly disavowing claim coverage." *Kopykake Enters. v. Lucks Co.*, 264 F.3d 1377, 1382 (Fed. Cir. 2001) (internal quotation and citation omitted). Any such disavowal "must be clear and unmistakable." *Anchor Wall*, 340 F.3d at 1307. Finally, extrinsic evidence such as expert testimony may be considered only where the language of the claims remains ambiguous after consideration of the claim language, specification and file history. *Key Pharms. v. Hercon Lab. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998). "[E]xtrinsic evidence in general, and expert testimony in particular, may be used only to help the court come to the proper understanding of the claims; it may not be used to vary or contradict the claim language." *Vitronics*, 90 F.3d at 1584.

## B. Claims Requiring Construction

The terms whose meanings are in dispute appear in independent Claims 1 and 9 and dependent claims 2, 3, 6, 9, 10, 11, and 12. The claims are stated below; the disputed terms are emphasized.[1]

---

[1] The parties initially disputed several other terms but now agree to their meaning. I find that the proposed constructions are supported by the intrinsic evidence, and list below the terms and their agreed meanings.

***Claims 1 & 9: "Stretched Along the Length Thereof Between 50% and 300% of the Original Length"*** is construed as "the original film is stretched until its stretched length is 50% to 300% greater than its original length, *i.e.*, stretching such that the final stretched length is between 1.5 times to 4 times that of the original length. This can be expressed by the formula: (stretched length - unstretched original length) / (unstretched original length) x 100% = between 50% and 300%."

***Claim 1: "Two Opposite Outermost Side Edges Being Folded Over Along the Lateral Direction to the Length"*** is construed as "the film's lateral edges are turned inward onto themselves."

1. A **roll of stretched plastic film for wrapping a pallet load**, said film having two opposite outermost side edges and an unstretched original length, said film being stretched along the length thereof between 50% and 300% of the original length, the two opposite outermost side edges being folded over along the lateral direction to the length for strengthening the outermost edges of the film, the stretched film then being rolled.

2. A roll of stretched plastic film as claimed in claim 1 wherein said plastic film has an **impressed textured surface to trap air so as to facilitate unwinding of said roll of stretched film**.

3. A roll of stretched plastic film as claimed in claim 1 wherein said film presents a **variable gauge thickness to trap air in said rolled film so as to facilitate the unwinding of said roll of stretched film.**

6. A roll of stretched plastic film as claimed in claim 1, wherein said stretched film has **increased strength characteristics due** to stretching.

9. A roll of stretched plastic film for wrapping a pallet load, said film having two opposite outermost side edges and an unstretched original length, said film being stretched along the length thereof between 50% and 300% of the original length, **the two opposite outermost side edges being thicker than the remainder of said stretched film for strengthening the outermost edges of the film**, the stretched film then being rolled.

10. A roll of stretched plastic film as claimed in claim 9 wherein said plastic film has an **impressed textured surface to trap air so as to facilitate unwinding of said roll of stretched film.**

11. A roll of stretched plastic film as claimed in claim 10 wherein said **stretched film presents a variable gauge thickness**.

12. A roll of stretched plastic film as claimed in claim 9 defined by a **single layer web** stretched along the length thereof.

---

*Claim 7: "Memory"* is construed as "a tendency for the stretched film to shrink or to contract toward its original, unstretched length."

*C. Claims 1 & 9: "A roll of stretched plastic film for wrapping a pallet load"*

Pliant asks me to construe the "roll of stretched plastic film" as a roll of "previously stretched (i.e., mechanically elongated) plastic film." Defendants object to the use of the term "previously," arguing that the inventor disclaimed the term during the patent's prosecution. The prosecution history reveals that the inventor's proposed claims were rejected several times before approval. Until the final set of claims was proposed in 1995, the inventor consistently used the term "prestretched." The inventor used the term to convey the idea that the stretching occurred before the plastic was rolled. In October 1995, the patent examiner proposed a new claim to "correct[ ] ambiguities in the claim." The proposed claim substituted the word "stretched" for "prestretched." The inventor adopted this language, uniformly substituting "stretched" for "prestretched" when proposing his final amendments. Nonetheless, the revised claim continues to teach that the film is first stretched, then rolled. Those amendments were approved by the patent examiner.

On the basis of this prosecution history, Defendants ask me to find that the patentee explicitly disclaimed the concept of prestretching.

> The purpose of consulting the prosecution history in construing a claim is to "exclude any interpretation that was disclaimed during prosecution." Accordingly, "where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." Such a use of the prosecution history ensures that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers.

*Chimie v. PPG Indus. Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) (citations omitted). The substitution of "stretched" for "prestretched" in response to the patent examiner's concerns about

6

ambiguity was not a clear disavowal of the concept that the film is stretched before it is rolled. However, Pliant's proposed insertion of the word "previously" into its proposed construction of the claim is unnecessary. (*See* '393 Patent, Claims 1 and 9) ("the stretched film then being rolled"). If anything, it adds an element of ambiguity into a claim amended to remove unnecessary confusion. Therefore, I construe the term "a roll of stretched plastic film" to mean "a roll of stretched (i.e., mechanically elongated) plastic film."

The parties also dispute whether the preamble language "for wrapping a pallet load" limits the invention. Preamble language typically does not limit the claims. *DeGeorge v. Bernier*, 768 F.2d 1318 (Fed. Cir. 1985). However, a preamble will limit the invention

> if it recites essential structure or steps, or if it is "necessary to give life, meaning and vitality" to the claim. Conversely, a preamble is not limiting "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention."

*Catalina Mktg. Int'l v. Coolsavings*, 289 F.3d 801, 808 (Fed. Cir. 2002) (citations omitted). A preamble may "limit the scope of the claim . . . when patentability depends on limitations stated in the preamble" or "when the preamble contributes to the definition of the claimed invention." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1350 (Fed. Cir. 1998) (citations omitted). However, when a preamble "simply states the intended use or purpose of the invention" it does not limit the scope of the claim "unless the preamble provides antecedents for ensuing claim terms and limits the claim accordingly." *Id*.

In this case, the preamble language "for wrapping a pallet load" indicates the intended use and purpose of the invention. Relying on *GE v. Nintendo Co.*, 179 F.3d 1350, 1361-62 (Fed. Cir. 1999), Pliant suggests that the preamble language constitutes a limitation because it defines

7

the specific problem the inventor intended to solve with his invention: a method for wrapping pallet loads. Pliant also argues that the preamble language is essential to understanding limitations and terms in the claim body because it "provides an important structural guidepost for the person of ordinary skill in the art." (Pl. Rep. Br. at 2.) The crux of Pliant's argument is that the pallet load language provides context without which the claim lacks meaning.

I disagree. The claims are not incomplete without reference to their intended use in the field of pallet wrapping. *But see Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 880 (Fed. Cir. 1991) (the preamble language described a "reference point" that was useful in understanding and construing the claim). Moreover, to read the claim to cover other uses would not be "divorced from reality." *GE*, 179 F.3d at 1362. In *GE*, the court found that the inventors were working on the "particular problem of displaying binary data on a raster scan display device and not general improvement to all display systems." *Id*. at 1361-62. The invention would not have worked for other display devices; it functioned only with display devices that worked by displaying bits. *Id*. at 1362. In this case, the invention could be used for wrapping things other than a pallet load (particularly when the pallet loads referenced in the preamble are not limited in any way, *e.g.*, by size or shape.)[2] "For wrapping a pallet load" is simply a statement of the intended use of the invention and does not limit the claimed invention.

---

[2]For this reason, the preamble language also fails as an antecedent for the language of dependent claim 7, which states:
> A roll of stretched plastic film as claimed in claim 1 wherein said plastic film is stretched to impart a memory to said stretched film to permit contraction of said stretched film when unwound to wrap said pallet load.

('393 Patent, Col. 9, ll. 18-21.)

*D. Claims 1 & 9: "unstretched original length"*

The parties generally agree that this claim should be defined as "the length of the stretched plastic film before mechanical elongation." Pliant seeks to add the word "solid" before stretched plastic film, so as to distinguish this element of the claim from the processes for producing plastic film. Yet there is no basis in the specification (or elsewhere) for adding this term. Pliant's proposed construction is unnecessary given the unambiguous meaning of the claim language and is potentially confusing. Therefore, the term "unstretched original length" is construed as "the length of the stretched plastic film before mechanical elongation."

*E. Claims 2 & 10: "an impressed textured surface to trap air so as to facilitate unwinding of said roll of stretched film"*

Dependent Claims 2 and 10 explain that the roll of stretched film has an "impressed, textured surface" that traps air between the layers of film and facilitates unwinding of the roll. Pliant asks me to construe these claims as "the plastic film has an embossed pattern that helps trap air and ease unwinding." Defendants argue that while this definition reflects the ordinary meaning of the claim terms, it fails to reflect explicit disclaimers made during the patent prosecution as well as limiting language found in the specification. To that end, Defendants propose that I construe the dependent claim as:

> the plastic film has an embossed pattern–i.e., pockets or raised portions–that helps trap air and ease unwinding. The embossed pattern is created by the deliberate application of force to create pockets or raised portions utilizing an embossing roller, and thus would not include incidental impressions, scratches, or markings caused by passing the film over grooved rollers or by stretching of the film.

I begin with the ordinary meaning of the claim language. The parties agree that "impressed, textured surface" is not a term of art. Pliant argues that the term "impress" must be

9

given its ordinary meaning, as defined by a dictionary, which is to produce a mark by pressure, or to imprint. The most recent Federal Circuit opinion to address the role of dictionaries in construing the ordinary meaning of terms, relative to instrinsic evidence, explains: "[p]roperly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Phillips*, 415 F.3d at 1321. "[H]eavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification." *Id*.

While Defendants do not disagree *per se* with Pliant's dictionary-based construction of the ordinary meaning of impress, they would add several additional limitations to the definition based on the specification. Defendants' primary argument is that the specification requires that the impressed textured surface originates through "the deliberate application of force," so as to exclude any markings that result from incidental impressions or scratches, for example, those produced by grooved rollers or mechanisms used to stretch the film. Defendants point to elements of the specification that teach that the "embossed pattern" is generated by contacting the plastic film with a "textured roller" containing a "textured cylindrical surface." ('393 Patent, Col. 4, ll. 56-64.) Defendants further note that the specification explains that the "textured roller" with a "textured rubber surface . . . presents a patterned contour designed to impress a pattern onto the film." ('393 Patent, Col. 5, ll. 12-14). Based on this language and Figures 3 and 4 of the specification, Defendants argue that the specification must be construed to require the creation of an embossed pattern by "the application of frictional force between the plastic film and specially designed, spiked protrusions of the textured surface." (Def. Sigma Br. at 11.)

Defendants' proposed language would result, improperly, in a much narrower interpretation of the claims than their language requires. *See Fuji Photo Film Co. v. ITC*, 386 F.3d 1095, 1106 (Fed. Cir. 2004) ("the scope of the claims is not limited to the preferred embodiments described in the specification") (citing *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1365 (Fed. Cir. 2003)). I find no basis for limiting the otherwise ordinary meaning of the claims to Defendants' highly nuanced and restrictive reading of the preferred embodiment.

The parties agree that the claim requires that the embossed film have a "pattern." By definition, this pattern is not random, and must be created by a means sufficient to produce a pattern rather than random marks. The means identified in the specification are textured rollers, which are described in detail throughout the specification and the accompanying figures. ('393 Patent, Col. 6, ll. 10-10; Figs. 3b, 4, 11.) While the use of textured, embossing rollers are the only means specified for creating this pattern, the inventor is not limited to this embodiment. "An applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001) (citations). Therefore, I will not construe the claim to require more than the ordinary meaning of the terms require: "the plastic film has an embossed pattern that helps trap air and ease unwinding."[3]

---

[3] I do not decide here whether the patent encompasses a pattern created by "grooved rollers." Defendants make a fairly good argument that the inventor clearly distinguished the "textured" roller means identified in the specification from "normal, prior art" rollers. In describing the invention, the specification suggests that the preferred embodiment uses two textured rollers. ('393 Patent at Col. 6, lines 10-11.) However, the specification also explains that an alternative embodiment may use one textured roller and one "normal, prior art" roller. (*Id.* at Col. 6, lines 11-19.) This direct comparison of textured with "normal, prior art" rollers constitutes a clear disclaimer of the latter. *Cf. SciMed*, 242 F.3d at 1342-43 (limiting the claim based on the patent's discussion of the disadvantages of certain prior art structures and the advantage of the features found within the patent specification). Nonetheless, Defendants failed to establish that grooved rollers are the "normal, prior art" rollers to which the inventor refers.

*F. Claims 3 & 11: "a variable gauge thickness to trap air in said rolled film so as to facilitate the unwinding of said roll of stretched film"*

Defendants also challenge Pliant's proposed construction of dependent claims 3 and 11. The disputed term is "variable gauge thickness." Plaint would construe the disputed term to mean, "the plastic film has thickness variations that help trap air and ease unwinding." Once again, Defendants propose a more detailed and limiting construction:

> a variation in film thickness that is large enough to form pockets or raised portions that can trap air. The variation in thickness is deliberately produced, and thus would not include thickness variations resulting from the film manufacturing process, such as incidental impressions, scratches, or markings caused by passing the film over grooved rollers or by stretching of the film. As such, the variation in film thickness must be greater than about ±20% to ±30%.

The parties again agree that variable gauge thickness is not a term of art. Neither party disputes the ordinary meaning of variable. Moreover, both parties agree that gauge generally refers to thickness. I suspect that both parties would agree that the inventor's choice of words was inapt, as under these definitions, the phrase "gauge thickness" is redundant.

The specification fails to offer any insight into the term; for this reason, Pliant suggests that the term is "merely . . . a slightly different way of articulating the notion of a contoured surface that helps to trap air as the film is wound onto the roll." (Pl. Br. at 12.) Under Pliant's definition, variable gauge thickness means that the thickness of the plastic varies from point to point based on contours on the surface of the film. In contrast, Defendants rely on the same "disclaimer" argument that they offered, and I rejected, in support of their definition of

---

Defendants' expert, Dr. Susan Selke, merely established that one of ordinary skill in the art at the time of the patent application would distinguish grooved rollers from embossing rollers. As it stands, whether grooved rollers are the "normal, prior art rollers" disclaimed by the patent is not a matter for claim construction but for the infringement or invalidity arguments to follow.

"impressed, textured, surface." Once again, I am not persuaded that the inventor clearly disclaimed anything not expressly included in the preferred embodiment.

Defendant Sigma also finds a lack of clarity in the claim language, the specification and the prosecution history. In essence, Sigma asks: "variable relative to what?" To answer that question, Sigma turns to extrinsic evidence. Sigma proposes that "variable gauge thickness" be construed as any thickness greater than the standard variations in thickness inherent in the manufacture of plastic films (as known to one of ordinary skill in the art at the time of the patent.) It is not necessary to turn to extrinsic evidence to address the degree to which the film thickness must vary. The claim language provides the answer to this question: the gauge must vary enough "to trap air . . . so as to facilitate the unwinding" of the roll. For this reason, I accept Pliant's proposed definition of the disputed claim. Whether or not the claim encompasses "unpatentable thickness variations" is a matter to be addressed at another time.

## *G. Claim 6: "said stretch film has increased strength characteristics due to stretching"*

Defendant Sigma asks me to limit the term "increased strength characteristics" to "ultimate strength." It bases this argument on language found in the specification. ('393 Patent, Col. 4., ll. 15-16) ("It is well known that most plastic films when stretched above their yield point gain significantly in ultimate strength"). Pliant now asks me to turn to extrinsic evidence, namely the declaration of its expert, to construe the proper meaning of "strength characteristics." However, I find that the inventor defined the strength characteristic relevant to the invention within the specification. Because this intrinsic evidence provides clear guidance as to the meaning of the term "strength characteristics," I need not look to extrinsic evidence in order to construe the term. "Increased strength characteristic" means "an increase in the ultimate strength of the film."

13

*H. Claim 8: "wherein said film is stretched approximately 200%"*

The parties agree that this term should be construed as "the plastic film is stretched 200 percent, plus or minus standard manufacturing tolerances." Defendant Sigma proposes to define the margin for manufacturing tolerances as ± 1% and presented expert testimony in support of this narrow construction. Nothing in the specification or prosecution history supports this narrow, numerical construction of the term "approximately." *Cf. Cordis Corp.*, 339 F.3d at 1360 ("[t]he question presented here is whether there is anything in the prosecution history of either patent that justifies giving the 'substantially uniform thickness' limitation an even narrower construction"). For this reason, the disputed term is construed as suggested by Pliant without any further numerical limitation.

*I. Claim 9: "the two opposite outermost side edges being thicker than the remainder of said stretched film for strengthening the outermost edges of the film"*

Claim 9 is an independent claim that mirrors claim 1 but for two words. Whereas claim 1 purports to improve upon prior stretch film through folded edges, claim 9 achieves the same objective through "thicker" edges. Pliant, adhering to the plain language of the claims and the doctrine of claim differentiation, would construe claim 9 to include any means of thickening the edges other than folding, and argues that folded edges are a subset of the larger universe of thicker edges. Defendants assert that the inventor expressly disclaimed any means of thickening edges other than folded edges, and that notwithstanding the doctrine of claim differentiation, claim 9 must be construed as requiring folded edges. In the alternative, Defendants ask that I find that at the very least, claim 9 excludes edges thickened by neck down.[4]

---

[4] Neck down is the process by which a plastic film narrows as it is stretched, causing the edges to become thicker. ('393 Patent, Col. 6, ll. 29-42.)

The doctrine of claim differentiation presumes that there is "a difference in meaning and scope when different words or phrases are used in separate claims." *Comark Communs. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987)). If a lack of difference in meaning or scope would render a claim redundant or superfluous, the doctrine of claim differentiation presumes that the different language is significant. *Id*. at 1187. However, the doctrine cannot restore to claims a scope that has been shown to be unwarranted. *See Tandon*, 831 F.2d at 1024 ("[w]hether or not claims differ from each other, one can not interpret a claim to be broader than what is contained in the specification and claims as filed") (citations omitted). As with all claim construction issues, I look first to the claim language, specification and the prosecution history to determine the meaning of the disputed claim terms.

When the prosecution history reveals a clear disclaimer as to the scope of a claim, that disclaimer will be binding on the claim's construction. *See C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 868-70 (Fed. Cir. 2004) (limiting claim based on disclaimers in prosecution history.) *See also Digital Biometrics v. Identix, Inc.*, 149 F.3d 1335, 1347 (Fed. Cir. 1998) (observing that the public has a right to rely on statements made during prosecution). The patent at issue in *C.R. Bard* involved a plug used to repair hernias. That patent included multiple claims, some of which contained an explicit limitation requiring "pleating" of the claimed plug, and some of which did not. The Court reviewed amendments submitted by the inventor during the initial prosecution and during re-examination. *C.R. Bard*, 388 F.3d at 866-69. During the initial prosecution, in an attempt to overcome the Examiner's rejection of multiple claims, the inventor made broad arguments that explicitly or implicitly required "pleating." *Id*. at 866-67. The Court refused to find that the "pleating" limitation made in those arguments *necessarily*

15

applied to the claim that lacked an express pleading limitation. *Id*. at 867. During a subsequent re-examination, the only claims at issue did not expressly require pleading. *Id*. at 868. However, in an effort to distinguish prior art, the inventor once again stated that the invention was pleated. *Id*. This time, the Court found the comments were directed explicitly to a claim whose language lacked a "pleating" limitation. *Id*. at 868-69. As such, the comments limited the claim. *Id*.

*C.R. Bard* set a high bar for finding that remarks within the prosecution history constitute a clear disclaimer applicable to all claims. That standard appears to conflict with a statement in an earlier Federal Circuit case: "[a]bsent qualifying language in the remarks, arguments made to obtain the allowance of one claim are relevant to interpreting other claims in the same patent." *Digital Biometrics*, 149 F.3d at 1347. *Digital Biometrics* was rightly concerned with the notice provided by "definitive statements" in patent prosecution. *Id*. Yet it failed to define the parameters of the relevance it granted these "global comments." *Id*. ("[a]bsent qualifying language in the remarks, arguments made to obtain the allowance of one claim are relevant to interpreting other claims in the same patent"). The only hint the case offers (aside from its own facts) is a citation to *Southwall Techns., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995) (emphasis added), in which the Court made the much narrower observation that "[a]rguments made during prosecution regarding the meaning of a *claim term* are relevant to the interpretation of *that term* in every claim of the patent absent a clear indication to the contrary."

I am persuaded to adopt the *C.R. Bard* standard in lieu of the *Digital Biometrics*-based standard in construing this claim. The *Digital Biometrics* standard, wherein global statements regarding the scope of the claims apply to all claims, was rejected in *C.R. Bard*. Cf. *Swimways Corp. v. Overbreak, LLC*, 354 F. Supp. 2d 637, 646 (E.D. Va. 2005) ("*C.R. Bard* does not stand for the principle that the use of [the] term in the claim preamble that defines a broad universe of

16

objects . . . must somehow be construed to apply to a small subset of that broad universe"). Furthermore, I find the *C.R. Bard* rule a corollary to the principle that an invention is not limited to its preferred embodiment, but only to what is clearly excluded from the claims. *See Fuji Photo*, 386 F.3d at 1104-05.

In this case, Defendants' examples of disclaimers that would limit claim 9 to folded edges fail the *C.R. Bard* test. The Information Disclosure Statement states that the invention relates to a roll of stretched film "presenting two opposite side edges folded along the lateral direction to said length." A Petition to Make Special included a sworn declaration from the inventor stating that the invention "in particular, relates to a roll of stretched plastic film . . . [with] opposite side edges folded along the lateral direction." The claims were rejected once as anticipated. They were subsequently rejected, and after an amendment was filed the Examiner again rejected the claims as indefinite. After the indefiniteness rejection, the prosecuting attorney twice noted that "the claims have been amended so as to particularize . . . the two opposite, outermost side edges being folded and stretched." All of these statements were global in nature; none were directed specifically to independent claim 9. Moreover, although the Examiner only approved the patent after multiple rejections and all of the above-noted assertions by the inventor and prosecuting attorney, he nonetheless approved a patent with two independent claims, the latter of which clearly required only thicker edges.[5]

Nonetheless, I do find one limitation of claim 9 in a much clearer and targeted disclaimer found within the patent itself. The '393 patent proclaims that the invention has "strengthened tear characteristics than that presently available by the prior art." ('393 Patent, Col. 2, ll. 23-24.)

---

[5]Defendants make a decent case for the fact that claim 9 is invalid because it adds impermissible "new matter" in violation of 35 U.S.C. § 132. While this argument may ultimately prevail, it is not a matter for claim construction.

The prior art includes rolls of stretched film. (*Id*. at Col. 1, ll. 62-64.) Later in the specification, the patent states that "the relative spacing between first textured roller [ ] and second textured roller [ ] is selected so as to *minimize the 'neck down' of the film* as it is stretched between said first and second textured rollers [ ]." (*Id*. at Col. 6, ll. 33-37.) The parties agree that neck-down occurs when the film is stretched, and that an aspect of "neck down" is a relative thickening of the side edges of the film. Without question, the patent expressly disclaims prior art rolls and explicitly teaches that neck-down (and thereby its inherent thickening) should be minimized. *Cf. SciMed*, 242 F.3d at 1341 (disclaimer occurs when the specification "makes clear that the invention does not include a particular feature"). For this reason, claim 9 is construed to exclude thickening that results from "neck down."

*J. Claim 12: "single layer web"*

Finally, the parties dispute the meaning of "single layer web." Pliant defines single layer web as a "single sheet of plastic film," and more specifically, one that is comprised of one or more discrete polymer layers. Atlantis argues that "single layer" refers to the layers of polymers within the film itself, rather than the resulting web, or sheet, of plastic film. At issue is not the meaning of "single layer" so much as a determination of what the word "single" modifies.

The inventor did not attempt to define "single layer web;" in fact, in an earlier version of the patent application the Examiner found that claim to lack support in the specification. However, in the final version, the word "layer" appears three times in the specification. In the first two instances, it appears in discussions of a prior art reference that teaches a double-layer plastic film used to stretch-wrap goods. Pliant suggests that the term "layer," as used in the prior art reference, refer to the sheets (or web) of plastic film, not the polymer layers comprising the

film.[6] I cannot agree with Pliant without construing the meaning of the claims of the '706 patent, which is not before me. The third reference to "layer" in the '393 patent appears in a description of the benefits of a pulley adjusting mechanism, which allows the operator to control the speed of the invention's rollers. The specification concludes: "[i]n other words, the amount of air that is trapped in the layer of the wrapped film may be controlled." ('393 Patent, Col. 7, ll. 42-44.) Here, "layer" clearly refers to the sheet of film without addressing the polymer layer or layers that comprise the film.

Atlantis complains that Pliant is relying on a term that was removed after it was subject to challenge by the Patent Examiner. Nonetheless, the term was subsequently added to the claim and approved by the patent examiner. The patent prosecution offers no other insight into the meaning of the term. Atlantis suggests relying on the term's plain meaning, which it construes as a web of film comprised of a single polymer layer. However, I find no support in the claims, specification or prosecution history for Atlantis's proposed construction, which would require that the sheet of film consist of only one discrete polymer layer. Therefore, I construe the term "single layer web" to mean "a single sheet of film consisting of one or more polymer layers."

ENTER:

*James B. Zagel*
_____
James B. Zagel
United States District Judge

DATE: February 15, 2006

---

[6]The '393 Patent states:
> Finally, U.S. Pat. NO. 4,499,706 teaches a double layer thermal plastic film which is used in pass through stretch wrapping of goods. The double layer improves the tear resistance and puncture resistance of the film.

('393 Patent, Col. 1., ll. 58-61.)